# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

DON PHILIPPI,                                  )
                                               )        3:11-cv-00272-LRH-VPC
                    Plaintiff,                 )
                                               )
        v.                                     )        **REPORT AND RECOMMENDATION**
                                               )        **OF U.S. MAGISTRATE JUDGE**
HOWARD SKOLNIK, *et al.,*                       )
                                               )
                    Defendants.                )        April 24, 2013
_____         )

        This Report and Recommendation is made to the Honorable Larry R. Hicks, United States

District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary judgment (#66)[1]

and errata (#68).  Plaintiff opposed (#71) and filed a cross-motion for summary judgment (#72) and

addendum (#73).  Defendants replied (#74).[2]  The court has thoroughly reviewed the record and

recommends that defendants' motion for summary judgment (#66) be granted in part, as follows:

## I.  HISTORY & PROCEDURAL BACKGROUND

        Plaintiff Don Philippi ("plaintiff"), a *pro se* inmate, is currently incarcerated at Northern

Nevada Correctional Center ("NNCC") in the custody of the Nevada Department of Corrections

("NDOC") (#30).   However, the allegations set forth in plaintiff's first amended civil rights

complaint pertain to events which occurred while plaintiff was incarcerated both at Lovelock

Correctional Center ("LCC") and NNCC.  *Id.*  On May 3, 2011, plaintiff filed a civil rights

---

[1] Refers to the court's docket numbers.
[2] The court notes that plaintiff's opposition (#71) and cross-motion for summary judgment (#72) were both untimely. However, the court will consider these documents in rendering its opinion.

complaint pursuant to 42 U.S.C. § 1983, alleging violations of his Fourteenth Amendment due process rights, Fourteenth Amendment equal protection rights, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), Eighth Amendment right to appropriate medical care and supervisory liability (#4). The court screened the complaint pursuant to 28 U.S.C. § 1915A, and permitted two claims to proceed: (1) plaintiff's Fourteenth Amendment due process claim for deprivation of property against defendants Valaree Olivas, Mitchell Nielsen and Stephen Thorn; and (2) plaintiff's RLUIPA claim against defendant Olivas (#3, p. 11). Thereafter, the court granted plaintiff's motion to amend the complaint (#29). On July 29, 2011, plaintiff filed a first amended civil rights complaint (#30), which attempted to add a First Amendment access to court and/or First Amendment retaliation claim(s) against defendant Julie Rexwinkle.[3] *Id.* at 8-11.

Plaintiff's first amended civil rights complaint contains three counts. In Count I, plaintiff alleges that defendants Olivas, Nielson and Thorn unlawfully confiscated his personal property, in violation of the Fourteenth Amendment (#30, p. 4). Plaintiff contends that defendants falsified information on the Unauthorized Property Notification forms—specifically, that plaintiff's large storage box was not fire retardant and that plaintiff's Native American religious items were hobby craft. *Id.* Plaintiff also contends that defendant Nielson placed state property inside of plaintiff's duffel bag when he should have placed plaintiff's personal property inside the bag. *Id.* at 6. Finally, plaintiff contends that defendant Thorn did not place plaintiff's medications in the duffel bag. *Id.*

In Count II, plaintiff alleges that defendant Olivas unlawfully seized his Christian and Native American religious items, in violation of RLUIPA. *Id.* at 7.

---

[3] The court notes that plaintiff attempted to resurrect his supervisory liability claim against defendant Howard Skolnik (#30, p. 2). However, the court dismissed Howard Skolnik from this litigation with prejudice in its May 2, 2011, screening order (#3, pp. 7-8).

In Count III, plaintiff alleges that defendant Rexwinkle and other unnamed defendants interfered with plaintiff's legal mail, in violation of his First Amendment right to access the court and/or First Amendment right to be free from retaliation.  Specifically, plaintiff alleges that on May 19, 2011, plaintiff attempted to mail his initial installment of the filing fee to the court.  *Id.* at 10.  However, a mail room worker or a banking services worker intercepted plaintiff's legal mail and forwarded it to defendant Rexwinkle.  *Id.* at 8.  Nevertheless, on May 25, 2011, plaintiff received two receipts from the court showing proof of payment.  *Id.* at 10.

Defendants contend that on September 17, 2009, defendant Olivas was summoned to the LCC property room to prepare a substantial amount of plaintiff's personal property for transport (#66-1, Ex. A, ¶ 7).[4]  Plaintiff had been admitted to Carson-Tahoe Hospital for unknown medical reasons, and he was scheduled to remain in NNCC's Regional Medical Facility after his release from the hospital.  Accordingly, LCC staff had to prepare plaintiff's personal property for transport to NNCC.  *Id.*

NDOC AR 711 governs inmate personal property (#66-1, Ex. A, ¶ 8; #66-2, Ex. B-1, p. 1).  AR 711's purpose is to prevent the introduction of contraband that would constitute a threat to NDOC staff, inmates, or the security of the institution; to prescribe certain limits for the volume and type of personal property in an inmate's possession; and to limit the amount of personal property an inmate can acquire and retain consistent with available space, health, sanitation and security needs (#66-1, Ex. A, ¶ 8; #66-2, Ex. B-1, p. 2).  In September 2009, when an inmate was transferred between institutions, the inmate was limited to one duffle bag, one fire retardant box, three appliances and legal work (#66-1, Ex. A, ¶ 9; #66-2, Ex. B-1, p. 8).  Inmates were required to keep

---

[4] In September 2009, defendant Olivas was a Shift Lieutenant who was responsible for supervising and/or assisting staff in their daily activities (#66-1, Ex. A, ¶ 6).  Prior to her promotion to Shift Lieutenant, defendant Olivas was a Sergeant assigned to LCC's property room.  *Id.* at ¶ 2.  During her two and one-half years in LCC's property room, defendant Olivas was, and still is, familiar with NDOC's Administrative Regulation ("AR") 711—which governs inmate personal property.  *Id.* at ¶ 5.

their property in fire retardant boxes for safety, as inmates have been known to light items on fire and throw these items out onto the tier during episodes of disobedience (#66-1, Ex. A, ¶ 10).  If NDOC inmates were permitted to store their property in non-fire retardant boxes, then the safety of staff, inmates and property could be compromised if a fire were to start.  *Id.*  If an inmate possessed excess property upon transport, staff would complete a DOC 1517 "Unauthorized Property Notification" form (#66-1, Ex. A, ¶ 11; #66-2, Ex. B-1, p. 10).[5]  In the event an inmate was transferred to another institution under emergency circumstances and was unable to sign the DOC 1517, the form would be forwarded to the property officer at the receiving institution.  *Id.*

When NDOC staff deem an inmate's property to be unauthorized, the inmate has the option to ship or mail the property out at his own expense, donate the property to charity, have the property destroyed, or appeal the decision through the inmate grievance process (#66-1, Ex. A, ¶ 13).  If the inmate proceeds through the inmate grievance process, the unauthorized property will be stored until the process is completed (#66-1, Ex. A, ¶ 11; #66-2, Ex. B-1, p. 10).  These options appear on the Unauthorized Property Notification form that is provided to the inmate (#66-3, Ex. C).  AR 711 is made available to all LCC inmates, and it specifically states that inmates purchase property items at their own risk (#66-1, Ex. A, ¶ 12; #66-2, Ex. B-1, pp. 4, 21).

On September 17, 2009, defendant Olivas went to the LCC property room to inventory plaintiff's belongings (#66-1, Ex. A, ¶ 14).  She observed a large box wrapped in tape that did not bear the fire retardant insignia which was generally found on the bottom of NDOC's approved fire retardant boxes.  *Id.*  She also observed a smaller box that had another inmate's name and back number affixed on it.  *Id.*  These boxes were in addition to plaintiff's duffle bag, two appliances and

---

[5] Contraband is defined as any item not authorized by NDOC regulations or in excess of the maximum quantity permitted, any item that poses a serious threat to the institution, or any authorized property which has been altered (#66-2, Ex. B-1, p. 2).

one box of legal work.  *Id.*  Because plaintiff's large box was not fire retardant—it was merely a cardboard box wrapped in tape—and the smaller box did not appear to belong to him, defendant Olivas deemed the property within both boxes to be excess property.  *Id.* at ¶ 15.  Thereafter, defendants Olivas, Nielsen and Thorn went through both boxes and itemized each piece of property, and recorded the property on the Unauthorized Property Notification forms.  *Id.* at ¶¶ 15-16.  The excess property included dishes, game pieces, magazines, books, a photo album, clothes, personal hygiene items, food, nutritional supplements, musical instruments, compact discs and cassette tapes, shoes and other miscellaneous items.  *Id.* at ¶ 16.  Some of the property was altered, some of it was contraband, and some of it was in excess of the maximum property allowed under the regulations (#66-1, Ex. A, ¶ 16; #66-3, Ex. C-1).

Defendant Olivas also deemed unauthorized some feathers, a "dream-catcher," and a bag which she deemed to be hobby craft (#66-3, Ex. C-1).  Based on defendant Olivas's experience and training, she did not believe these items to be religious items as they were not stored in a religious box, nor in any protected manner (#66-1, Ex. A, ¶ 17).  Defendant Olivas also found that plaintiff possessed several items of contraband, including a small amount of tobacco, a tattoo needle concealed inside a pen, two melted toothbrushes, plastic tubing, two homemade screwdrivers made from glass frames, one altered pen used to transport items, and a guitar case with contraband concealed in the lining.  *Id.* at ¶ 18.  Defendant Olivas issued a Notice of Charges against plaintiff for possession of contraband and tattooing (#66-1, Ex. A, ¶ 18; #66-3, Ex. D-1, p. 68).

After plaintiff was transferred to NNCC, he attempted to file a number of grievances regarding his unauthorized property, which were rejected as procedurally improper (#66-3, Ex. E-1, E-2, E-3).  On December 14, 2009, plaintiff submitted Grievance Log No. 2006-28-89372, in which he stated:

> On 9-16-09—9-17-09 Lovelock correctional center/ Lt Olivas did not allow me to order/have/keep/ship with personal property according to AR 711(?) and kept all of missing property and unauthorized it.

(#66-3, Ex. E-4).  Plaintiff then referred to certain exhibits; however, the only document he attached to his grievance was NDOC's Inmate Personal Property Claim Form, in which he stated:

> On 9-16—9-17 of 2009, Lt Olivas rolled up my property and unauthorized almost every stich of personal items and canteen items authorized at LCC.  The liability falls on the institution (LCC) because it allows its staff and officials to break AR's at their chosing [sic] as a form of punishment/discipline and allowing Lt Olivas to train lesser officers incorrectly and allowing it to continue[.]

*Id.*  Plaintiff's grievance was denied at all levels because plaintiff possessed excess property at the time of transport; hobby craft and musical instruments are not transferred between institutions; and some of plaintiff's property items were altered and/or contraband.  *Id.*  Plaintiff did not reference religious property in Grievance Log No. 2006-28-89372 or suggest that he was unable to practice his faith because religious property items had been confiscated.  *Id.*

On October 31, 2010, plaintiff submitted Grievance Log No. 2006-29-08607, in which he stated that defendants Olivas, Nielson and Thorn "took my native religious items and under false pretences [sic] un-authorized them as hobby craft violating my First Amendment right to freedom . . . of religion" (#66-3, Ex. E-5).  On November 17, 2010, this grievance was rejected as untimely.  *Id.* From November 17, 2010, through the filing of plaintiff's first amended civil rights complaint, he submitted only two grievances—one addressing issues with the NNCC classification committee and an alleged denial of visitation rights, and one addressing an issue with his medication (#66-3, Ex. E, pp. 2-3).

On July 16, 2012, defendants deposed plaintiff (#66-4, Ex. F).  Plaintiff testified that he believed his property was not unauthorized because he had been transferred from other institutions in the past and had been allowed to possess the same property.  *Id.* at 27, 31.

Plaintiff testified that in 2002 or 2003, he was baptized Pentecostal but that "right now" he was studying Native Religion.  *Id.* at 40-41.  Plaintiff stated that his RLUIPA claim was based on the confiscation of his leather-bound Bible, hard-cover MacArthur Study Bible, eagle and hawk feathers, two medicine bags, "dream-catcher," and a necklace with a stone.  *Id.* at 45, 47-48.  Plaintiff stated that he used the eagle feather for Native American smudging ceremonies, but that he was "learning that" it was against federal law for him to possess an eagle feather.  *Id.* at 48-49.  Plaintiff testified that the Native American items which defendants had confiscated held special significance for him, but that he was not aware if they were related to any specific faith as he "[didn't] know what to look for" and "[didn't] know what to study."  *Id.* at 51.  Plaintiff also testified that he did not go onto Native American land because he was not a member, did not live on a reservation, and did not "have a number, a Dawes number, a roll number . . .."  *Id.*

NNCC Chaplain James Stogner stated that plaintiff is not on his list of NNCC inmates who participate in Native American activities (#66-4, Ex. G, ¶ 14).  Chaplain Stogner also stated that plaintiff has not submitted a Faith Group Affiliation Declaration Form, which should be completed by every inmate who wishes to be identified with a specific religious faith; and that plaintiff has not had a Religious Property Inventory form prepared by a property officer.  *Id.*  Chaplain Stogner notes that from January 21, 2005, through April 24, 2009, plaintiff communicated to his caseworker that his faith was Christian and/or Pentecostal.  *Id.* at ¶ 15.  On September 20, 2011, plaintiff communicated to his caseworker that his faith was Native American.  *Id.* at ¶ 16.  On April 11, 2012, plaintiff informed his caseworker that he had not yet obtained his native card, but "was working on it."  *Id.*

Chaplain Stogner opined that plaintiff could not participate in the Native American smudging ritual, sweat lodge, or pipe ceremonies due to his inability to prove that he was enrolled in a

federally recognized tribe, or prove that he had a credible association with a tribe.[6]  *Id.* at ¶ 17.

However, Chaplain Stogner opined that even though plaintiff could not participate in Native

American holidays or ceremonies because he is not a documented Native American, he could still

hold Native American beliefs and could go onto Native American grounds.  *Id.* at ¶ 18.  Chaplain

Stogner declared that the confiscation of plaintiff's alleged Native American religious property items

did not preclude plaintiff from holding Native American beliefs or from going onto Native American

grounds.  *Id.*

Defendants move for summary judgment on the following grounds: (1) plaintiff alleges that

defendants engaged in an unauthorized intentional deprivation of plaintiff's personal property, which

is not a cognizable claim under 42 U.S.C. § 1983; (2) in the alternative, defendants properly

unauthorized plaintiff's property, pursuant to NDOC's AR 711, which is a valid regulation

reasonably related to a legitimate penological interest; (3) plaintiff failed to exhaust his

administrative remedies with respect to his RLUIPA claim; (4) in the alternative, the confiscation of

plaintiff's alleged religious property items did not substantially burden plaintiff's religious exercise;

and (5) plaintiff failed to exhaust his administrative remedies with respect to his First Amendment

access to court and/or First Amendment retaliation claim(s) (#66, p. 2).  Defendants attach several

documents to support their motion for summary judgment, including: (1) the declaration of Valaree

Olivas (#66-1, Ex. A); (2) forty-four photographs of plaintiff's unauthorized property (#66-1, Ex. A-

1);[7] (3) the applicable version of NDOC's AR 711 covering "Inmate Personal Property" (#66-2, Ex.

B-1);[8] (4) the applicable version of NDOC's AR 740 covering "Inmate Grievance Procedure" (#66-

---

[6] Chaplain Stogner stated that smudging in cells is prohibited.  *Id.* at ¶ 17.
[7] Authenticated by the declaration of Valaree Olivas (#66-1, Ex. A, ¶ 19).
[8] Authenticated by the declaration of Maxcine S. Blackwell (#66-2, Ex. B, ¶ 5).

2, Ex. B-2);[9] (5) the applicable version of NDOC's AR 810 covering "Religious Faith Group Activities and Programs" (#66-2, Ex. B-3);[10] (6) plaintiff's September 16, 2009, NDOC Inmate Inventory Transfer form (#66-3, Ex. C-1);[11] (7) plaintiff's September 17, 2009, NDOC Unauthorized Property Notification forms (#66-3, Ex. C-1);[12] (8) plaintiff's notice of charges, preliminary hearing summary, and disciplinary hearing summary (disciplinary forms I, II, and III) for Offense in Custody No. 297197 (#66-3, Ex. D-1);[13] (9) plaintiff's Grievance Log No. 2006-28-83720 (#66-3, Ex. E-1);[14] (10) plaintiff's Grievance Log No. 2006-28-88283 (#66-3, Ex. E-2);[15] (11) plaintiff's Grievance Log No. 2006-28-88288 (#66-3, Ex. E-3);[16] (12) plaintiff's Grievance Log No. 2006-28-89372 (#66-3, Ex. E-4);[17] (13) plaintiff's Grievance Log No. 2006-28-08607 (#66-3, Ex. E-5);[18] (14) a certified copy of the transcript from plaintiff's July 16, 2012, deposition (#66-4, Ex. F); and (15) the declaration of James Stogner (#66-4, Ex. G).

Plaintiff opposes defendants' motion for summary judgment on the following grounds: (1) defendants engaged in an authorized intentional deprivation of plaintiff's personal property, which is a cognizable claim under 42 U.S.C. § 1983 (#71, p. 2); (2) plaintiff possessed the property in question for approximately eight years—throughout countless cell searches and bed moves (#71, pp. 2, 11); (3) defendants fabricated information on the Unauthorized Property Notification forms (#71, pp. 6, 11, 22); (4) defendants should not have confiscated the property within plaintiff's large fire retardant box simply because the box had tape on it (#71, p. 7); (5) defendant Nielsen should have

---

[9] Authenticated by the declaration of Maxcine S. Blackwell (#66-2, Ex. B, ¶ 6).
[10] Authenticated by the declaration of Maxcine S. Blackwell (#66-2, Ex. B, ¶ 7).
[11] Authenticated by the declaration of Brian Wagner (#66-3, Ex. C, ¶ 4).
[12] Authenticated by the declaration of Brian Wagner (#66-3, Ex. C, ¶ 5).
[13] Authenticated by the declaration of Melanie McBroom (#66-3, Ex. D, ¶ 4).
[14] Authenticated by the declaration of Monica Navarro (#66-3, Ex. E, ¶ 4).
[15] Authenticated by the declaration of Monica Navarro (#66-3, Ex. E, ¶ 5).
[16] Authenticated by the declaration of Monica Navarro (#66-3, Ex. E, ¶ 6).
[17] Authenticated by the declaration of Monica Navarro (#66-3, Ex. E, ¶ 7).
[18] Authenticated by the declaration of Monica Navarro (#66-3, Ex. E, ¶ 8).

placed more personal items in plaintiff's duffel bag when packing plaintiff's property for transport (#71, p. 11); and (6) plaintiff's efforts to file a grievance contesting the confiscation of his religious property items were thwarted by Lisa Walsh (#71, p. 3).  Plaintiff attaches several documents to support his opposition and counter-motion for summary judgment and also filed an addendum with additional documentation.  The court has reviewed all of plaintiff's exhibits and finds that the majority of these documents are irrelevant to the issues before the court.

Defendants reply: (1) plaintiff has failed to state a cognizable due process claim under 42 U.S.C. § 1983 (#74, p. 8); (2) plaintiff has failed to provide any evidence that defendants neglected to follow AR 711, i.e., that plaintiff's large box was actually fire retardant or that his small box was actually authorized; (3) plaintiff has failed to provide any evidence that AR 711 is not reasonably related to a legitimate penological interest (#74, p. 7); (4) plaintiff has failed to provide any evidence that he properly exhausted his administrative remedies with respect to his RLUIPA claim (#74, pp. 7, 9); (5) plaintiff has failed to provide any evidence that the confiscation of his alleged religious property items substantially burdened his religious exercise (#74, pp. 8-9); and (6) there is no dispute that plaintiff has failed to exhaust his administrative remedies with respect to his First Amendment claims (#74, p. 9).

As a preliminary matter, the court notes that plaintiff is proceeding *pro se*.  "In civil cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

**A.     Legal Standards**

**1.  42 U.S.C. § 1983**

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290 (1999).  Section 1983 does not offer any substantive rights, but provides procedural protections for federal rights granted elsewhere.  *Albright v. Oliver,* 510 U.S. 266, 271 (1994).  To prove liability under § 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured by the Constitution or federal statutory law.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overturned on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

**2.  Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court will grant summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citations omitted).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the matters asserted, but must only determine whether there is a genuine issue of material fact that must be resolved by trial.  *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment motion.  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**B.    Analysis**

**1.    Fourteenth Amendment Due Process Claim**

Defendants assert that they are entitled to summary judgment on plaintiff's Fourteenth Amendment due process claim, as plaintiff alleges that defendants engaged in an unauthorized intentional deprivation of plaintiff's personal property, which fails to state a cognizable claim under

42 U.S.C. § 1983 (#66, p. 14).  In the alternative, defendants argue that AR 711 is a valid regulation reasonably related to legitimate penological interests, and that defendants' compliance with this regulation did not violate plaintiff's due process rights.  *Id.*

The Due Process Clause of the Fourteenth Amendment protects individuals from arbitrary government action by prohibiting states from depriving people of "life, liberty, or property without due process of law."  U.S. Const. amend. XIV.  To prevail on a claim of deprivation of property without due process of law, a plaintiff must first establish the existence of a constitutionally protected interest in the property.  *See Ingraham v. Wright*, 430 U.S. 651, 672-73 (1997).  Prisoners have a protected interest in their personal property.  *Hansen v. May*, 502 F.2d 728, 730 (9th Cir. 1974).  Once a protected interest in the property is found, the court need only decide what process is due under the Fourteenth Amendment, which is a question of law.  *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1984).

Often due process claims for deprivation of property arise from the allegation that a prison official engaged in an unauthorized or random act of destruction or deprivation of an inmate's property.  *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986); *Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).  However, the claim may instead relate to the assertion that a prison official deprived an inmate of his property pursuant to a regulation that does not serve a legitimate penological interest.  *Hudson*, 468 U.S. at 532 n.13; *Quick*, 754 F.2d at 1523-24.

Under the Supreme Court's rulings in *Parratt* and *Hudson*, a negligent or unauthorized, intentional deprivation of property does not give rise to a due process claim so long as the state provides an adequate post-deprivation remedy, such as the availability of a common-law state tort action against a private prison employee.  *Parratt*, 451 U.S. at 537-38; *Hudson*, 468 U.S. at 533.

The reasoning behind this rule is that a state cannot provide a pre-deprivation hearing for a property loss that the state cannot predict.  *Hudson*, 468 U.S. at 532-33.  On the other hand, if the deprivation of property is carried out pursuant to an established state procedure or regulation, then the plaintiff can state a claim under the Due Process Clause.  *See id.*; *Quick*, 754 F.2d at 1523-24.  In these cases, authorized property deprivations are permissible if conducted pursuant to a regulation that is reasonably related to a legitimate penological interest.  *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Although plaintiff attempts to save his Fourteenth Amendment due process claim by stating that defendants' actions constituted an *authorized* intentional deprivation of his personal property, plaintiff actually argues that defendants Olivas, Nielsen and Thorn engaged in an *unauthorized* intentional deprivation of his personal property.  Plaintiff states that "AR 711 did not violate plaintiff's Fourteenth Amendment due process rights.  The defendant[]s violated plaintiff's Fourteenth Amendment due process rights" (#71, p. 21).  Plaintiff also states that his property was "improperly deemed unauthorized by [defendants] by not following AR 711 correctly and making their decision on bad faith among other fabrications."  *Id.* at 2.  Finally, plaintiff states that "the confiscation and unauthorization of plaintiff's personal property was authorized by Lt. Valaree Olivas citing AR 711 as their reasoning.  That falls under an authorized deprivation was carried out pursuant to established state procedures, regulations, or statutes."  *Id.* at 21.

Because plaintiff alleges that NDOC officials were acting beyond prison policy, i.e., "not following AR 711 correctly," when they confiscated plaintiff's personal property, any alleged deprivation must be characterized as an unauthorized intentional deprivation of property in violation of established prison regulations and procedures.  Such deprivations do not give rise to liability under the Due Process Clause when there is an available state common-law tort remedy.  *See Hudson*, 468 U.S. at 531 n.11 (state post-deprivation remedy may be adequate even though it does

not provide identical relief to that available under § 1983).  Plaintiff has such a remedy under Nevada Revised Statute 209.243.  Therefore, he may not sue under 42 U.S.C. § 1983 for due process violations for the loss of his personal property.

Accordingly, the court recommends that summary judgment be granted in defendants' favor on plaintiff's Fourteenth Amendment due process claim.

## 2.  RLUIPA

Defendants assert that plaintiff did not exhaust his administrative remedies with respect to his RLUIPA claim (#66, p. 17).  In the alternative, defendants argue that the confiscation of plaintiff's alleged religious property did not substantially burden the practice of his religious beliefs.  *Id.* at 18.

### a.  Exhaustion

Failure to exhaust administrative remedies is an affirmative defense under the Prison Litigation Reform Act ("PLRA"), and the defendants bear the burden of proving that the plaintiff has not exhausted his administrative remedies.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Wyatt v. Terhune*, 315 F.3d 1108, 1117 n.9 (9th Cir. 2003), *cert. denied*, 540 U.S. 810 (2003).  Inmates are not required to specifically plead or demonstrate exhaustion in their complaints; rather, it is the defendant's responsibility to raise the issue in a responsive pleading.  *Jones*, 549 U.S. at 216.

Failure to exhaust is treated as a matter in abatement, not going to the merits of the claim, and is properly raised in an unenumerated Rule 12(b) motion.  *Wyatt*, 315 F.3d at 1119.  As such, failure to exhaust is not properly raised in a motion for summary judgment, but if it is so raised, it should be treated as a motion to dismiss.  *Ritza v. Int'l Longshoremen's & Warehousemen's Union*, 837 F.2d 365, 368 (9th Cir. 1988).  If the court ultimately finds that the plaintiff has not exhausted his nonjudicial remedies, the court should dismiss his claims without prejudice.  *Wyatt*, 315 F.3d at

1119-20, *as noted in O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1059 (9th Cir. 2007); *see also Ritza*, 837 F.2d at 368 n.3.

### i.   Prison Litigation Reform Act of 1996

The PLRA amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Although once within the discretion of the district court, the exhaustion requirement is now mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (citation omitted). Administrative remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter*, 534 U.S. at 524 (citing *Booth v. C.O. Churner*, 532 U.S. 731, 740 n.5 (2001)). Even when the prisoner seeks remedies that are not available in administrative proceedings—notably money damages—exhaustion is still required prior to filing suit. *Booth*, 532 U.S. at 741. Recent case law demonstrates that the Supreme Court has strictly construed section 1997e(a). *Id.* at 741 n.6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance; rather the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Proper exhaustion" means that the prisoner must use "all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* (citation omitted) (emphasis in original). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudication system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91.

ii.      **NDOC Procedures**

"[A]pplicable procedural rules [for proper exhaustion] are defined not by the PLRA, but by the prison grievance process itself."  *Jones*, 549 U.S. at 218.  NDOC's grievance procedure is governed by AR 740, which defendants have attached to their motion for summary judgment (#66-2, Ex. B-2).  AR 740 provides that an inmate may use the grievance procedure to "resolve addressable inmate claims including . . . personal property, property damage, disciplinary appeals, personal injuries, any other tort claim or civil rights claim relating to conditions of institutional life."  *Id.* at 11.  NDOC's grievance process has three levels of review: (1) an informal level grievance, which "shall be reviewed and responded to by the inmate assigned caseworker" in consultation with other appropriate staff; (2) a first level formal grievance, which "shall be reviewed and responded to by the Warden;" and (3) a second level formal grievance, which "shall be reviewed and responded to by either the Assistant Director of Operations, Assistant Director of Support Services, Offender Management Administrator, Medical Director, or Correctional Programs Administrator."  *Id.* at 10.

Once an inmate submits an informal grievance, NDOC logs the grievance into a tracking system.  *Id.* at 13.  The caseworker assigned to the grievance will provide the inmate with a response within twenty-five days, unless additional time is needed to conduct further investigation.  *Id.* at 14.  If the inmate is not satisfied by the caseworker's response, he may appeal the decision within five days by filing a first level formal grievance.  *Id.* at 15.  The Warden will provide the inmate with a response within twenty days.  *Id.* at 16.  If the inmate is not satisfied with the Warden's response, he may appeal the decision within five days by filing a second level formal grievance.  The appropriate NDOC official will provide the inmate with a response within twenty days.  *Id.* at 16-17.

If an inmate's grievance does not comply with procedural guidelines, the grievance is returned to the inmate with instructions for proper filing.  *Id.* at 16.  If the inmate's complaint

involves property damage, property loss, personal injury, medical claims, or any other tort claims (including civil rights claims), the inmate must submit his informal grievance within six months of the alleged injury.  *Id.* at 13.  Upon completion of the grievance process, inmates may pursue civil rights litigation in federal court.

### iii.       Plaintiff's Grievance Log No. 2006-28-89372

A prison's grievance process—not the PLRA—determines how detailed a grievance must be to satisfy the exhaustion requirement.  *Jones*, 549 U.S. at 218.  NDOC's AR 740.02 states that in filing a grievance, an inmate must include "[a]ll documentation and factual allegations available to the inmate" (#66-2, Ex. B-2, p. 14).  Plaintiff's grievance form stated:

> On 9-16-09—9-17-09 Lovelock correctional center/ Lt Olivas did not allow me to order/have/keep/ship with personal property according to AR 711(?) and kept all of missing property and unauthorized it.

(#66-3, Ex. E-4).  Plaintiff's attached Inmate Personal Property Claim Form stated:

> On 9-16—9-17 of 2009, Lt Olivas rolled up my property and unauthorized almost every stich of personal items and canteen items authorized at LCC.  The liability falls on the institution (LCC) because it allows its staff and officials to break AR's at their chosing [sic] as a form of punishment/discipline and allowing Lt Olivas to train lesser officers incorrectly and allowing it to continue[.]

*Id.*

While an inmate does not need to articulate a precise legal theory for "proper exhaustion" under the PLRA, a grievance only suffices if it alerts the prison to the nature of the wrong for which redress is sought.  *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).  The court finds that plaintiff's factual allegations were insufficient to put defendants on notice that plaintiff was alleging a violation of his religious rights.  Neither Grievance Log No. 2006-28-89372 nor the attached Inmate Personal Property Claim Form even referenced religious property—let alone suggested that plaintiff could not practice his faith because his religious property had been confiscated.  *Id.*  In

short, plaintiff's complaints did not adequately alert defendants to the factual allegations underlying plaintiff's RLUIPA claim.[19]  Thus, the court finds that plaintiff failed to exhaust his administrative remedies with respect to his RLUIPA claim.

Further, plaintiff's RLUIPA claim fails as a matter of law.

### b.  RLUIPA

The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  "A person may assert a violation of [RLUIPA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000cc-2(a).

To establish a RLUIPA violation, the plaintiff bears the initial burden to prove that the defendants' conduct imposed a "substantial burden" on his "religious exercise."  *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).  Once the plaintiff establishes a

---

[19] Plaintiff contends that NDOC employee Lisa Walsh improperly denied his October 31, 2010, informal grievance contesting the confiscation of his "native religious items" (#66-3, Ex. E-5).  The court finds plaintiff's contention has no merit.  AR 740 provides that for claims involving property damage, property loss, or any other tort claims (including civil rights claims), the inmate must submit his informal grievance within six months of the alleged injury (#66-2, Ex. B-2, p. 13).  Plaintiff did not submit his informal grievance contesting the confiscation of his religious property until October 31, 2010—thirteen months after the alleged injury.  Thus, Lisa Walsh properly denied plaintiff's informal grievance as untimely.  *See Woodford*, 548 U.S. at 90-91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.").

substantial burden, defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *Id.* at 995. The Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of religion" is at issue; (2) what "burden," if any, is imposed on that exercise of religion; (3) if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden," whether it is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest. *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2007), *aff'd en banc*, 535 F.3d 1058, 1068 (9th Cir. 2008).

Although RLUIPA does not define what constitutes a "substantial burden" on "religious exercise," the Ninth Circuit has stated that a substantial burden is one that is "'oppressive' to a 'significantly great' extent" and "a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier*, 418 F.3d at 995 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). The burden need not concern a religious practice that is compelled by, or central to, a system of religious belief, *see* 2000cc-5(7)(A); however, the burden must be more than a mere inconvenience. *Navajo Nation*, 479 F.3d at 1033 (internal quotations and citations omitted). A burden is substantial under RLUIPA when the state, "denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981) (internal quotations omitted)). The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." *See Navajo Nation*, 479 F.3d at 1033 (internal citations omitted). Although

RLUIPA "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion . . . the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkenson*, 544 U.S. 706, 725 n.13 (2005).

NDOC's Religious Faith Group Activities and Programs are governed by AR 810, which defendants have attached to their motion for summary judgment (#66-3, Ex. B-3). AR 810 provides that inmates participating in Native American faith group activities may possess a medicine bag, a choker, eagle feathers for qualified recipients,[20] one headband, and one "dream-catcher" (#66-4, Ex. G, ¶ 12). Any inmate may possess a Bible that is not "hard-covered." *Id.* Personal religious property must be stored in a "religious box" and must be clearly marked "faith property items" (#66-3, Ex. B-3, p. 22).

Plaintiff has the burden to prove that defendant Olivas's conduct imposed a "substantial burden" on his "religious exercise." *Warsoldier*, 418 F.3d at 994. Plaintiff has failed to make this showing. Plaintiff does not make any argument or set forth any evidence indicating that defendants' confiscation of his alleged religious property items created a substantial burden on plaintiff's religious exercise.

Chaplain Stogner opined that plaintiff could not participate in the Native American smudging ritual, sweat lodge, or pipe ceremonies due to his inability to prove that he was enrolled in a federally recognized tribe (#66-4, Ex. G, ¶ 17). Thus, aside from the fact that it is illegal for plaintiff to possess eagle feathers, plaintiff could not use his eagle feather for the smudging ritual because he is not a member of a federally recognized tribe and it is against prison policy to perform the smudging ritual in an inmate's cell. *Id.* Chaplain Stogner also opined that even though plaintiff

---

[20] AR 810 states that only Native Americans enrolled in federally recognized tribe may possess eagle feathers. An inmate enrolled in a federally recognized tribe must use NDOC's Religious Property Request Form to obtain eagle feathers and attach other documentation, as required by federal law (#66-3, Ex. B-3, pp. 10-11).

could not participate in Native American holidays or ceremonies because he is not a documented Native American, plaintiff could still hold Native American beliefs and go onto Native American ground. *Id.* at ¶ 18. Importantly, Chaplain Stogner declared that plaintiff could continue to study and hold Native American beliefs and go onto Native American ground despite the confiscation of plaintiff's alleged Native American religious property items. *Id.*

As for plaintiff's contention that the confiscation of his leather-bound Bible, hard-cover MacArthur Study Bible, and various Christian religious cards violated RLUIPA, the court finds that plaintiff has failed to prove that this confiscation inflicted a substantial burden on his religious exercise. First, on September 20, 2011, and again on April 11, 2012, plaintiff told his caseworker that his faith was Native American—not Christian. *Id.* at ¶ 16. Second, if plaintiff wished to possess a Bible, he could simply go to the NNCC chapel and obtain one. *Id.* at ¶ 19.

Plaintiff has failed to prove that defendants' confiscation of his alleged religious property items prevented him from "engaging in religious conduct or having a religious experience." *Navajo Nation*, 535 F.3d at 1091. Accordingly, the court recommends that summary judgment be granted in defendants' favor on plaintiff's RLUIPA claim.

### 3. First Amendment Access to Court/ First Amendment Retaliation claim(s)

Defendants assert that plaintiff failed to exhaust his administrative remedies with respect to plaintiff's First Amendment access to court and/or First Amendment retaliation claim(s) (#66, p. 18). In the alternative, defendants argue that even if defendant Rexwinkle somehow withheld plaintiff's legal mail, plaintiff cannot demonstrate an actual injury, as he has brought his complaint to court and proceeding accordingly. *Id.* at 20. Defendants also argue that plaintiff cannot demonstrate that any delay in his legal mail resulted in a chilling effect on the exercise of plaintiff's First Amendment rights. *Id.* at 21.

For an inmate to satisfy the PLRA's exhaustion requirement, "proper exhaustion of administrative remedies is necessary." *Woodford*, 548 U.S. at 84.  This requires an inmate to comply with the agency's deadlines and "other critical procedural rules . . .." *Id.* at 90.  AR 740 states that an inmate must complete the three-level grievance procedure in order to properly exhaust his administrative remedies (#66-2, Ex. B-2, p. 10).  Based on the court's review of plaintiff's grievance history, plaintiff plainly did not file any grievances related to his First Amendment access to court and/or First Amendment retaliation claim(s).

Accordingly, the court recommends that plaintiff's First Amendment access to court and/or First Amendment retaliation claim(s) (Count III) be dismissed from this action without prejudice to renew.[21]

## III.  CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that defendants are entitled to summary judgment in their favor as to plaintiff's Fourteenth Amendment due process claim (Count I) and plaintiff's RLUIPA claim (Count II), as there are no genuine issues of material fact for trial.  The court also concludes that plaintiff's First Amendment access to court and/or First Amendment retaliation claim(s) (Count III) should be dismissed from this action without prejudice to renew.  The parties are advised:

1.      Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and

---

[21] As the court recommends granting summary judgment in defendants' favor on plaintiff's Fourteenth Amendment due process claim (Count I) and plaintiff's RLUIPA claim (Count II); and recommends dismissing plaintiff's First Amendment access to court and/or First Amendment retaliation claim(s) (Count III) without prejudice to renew, it is unnecessary for the court to reach the issue of official capacity.

Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.       This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.    RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#66) be **GRANTED** as to plaintiff's Fourteenth Amendment due process claim (Count I) and plaintiff's RLUIPA claim (Count II).

**IT IS FURTHER RECOMMENDED** that plaintiff's First Amendment access to court and/or First Amendment retaliation claim(s) (Count III) be **DISMISSED** from this action without prejudice to renew.

**DATED:** April 24, 2013.

_Valerie P. Cooke_

_____
**UNITED STATES MAGISTRATE JUDGE**